RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOHN C. STOJETZ,

*Petitioner-Appellant,*

*v.*

No. 15-3116

TODD ISHEE, Warden,

*Respondent-Appellee.*

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:04-cv-00263—Gregory L. Frost, District Judge.

Argued: October 10, 2017

Decided and Filed: June 5, 2018

Before: BOGGS, CLAY, and KETHLEDGE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Michael J. Benza, LAW OFFICE OF MICHAEL J. BENZA, INC., Chagrin Falls, Ohio, for Appellant. Jocelyn K. Lowe, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Mark R. DeVan, BERKMAN, GORDON, MURRAY & DEVAN, Cleveland, Ohio, Laurence E. Komp, Manchester, Missouri, for Appellant. Jocelyn K. Lowe, Thomas Madden, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

BOGGS, Circuit Judge. On April 25, 1996, while incarcerated at Madison Correctional Institution, John C. Stojetz and five other inmates stormed a unit housing the State's juvenile

offenders.  *State v. Stojetz*, 705 N.E.2d 329, 333–34 (Ohio 1999).  After overpowering the guard, Stojetz and the others proceeded to the cell of 17-year-old Damico Watkins, with whom they had had prior altercations, and attacked him.  *Ibid.*  While Watkins escaped the initial assault, he was hunted throughout the multi-level complex, cornered, and stabbed to death by Stojetz and another inmate while he pleaded for his life.  *Ibid.*  Evidence submitted at trial indicated that Stojetz and his accomplices—who were members of the Aryan Brotherhood—killed Watkins, who was black, due in part to his race.  *Ibid.*

Stojetz was subsequently charged with one count of aggravated murder with prior calculation and design and with a death-penalty specification, namely, committing aggravated murder while a prisoner in a detention facility.  *Ibid.*  A jury found Stojetz guilty of the charge and the specification, and the trial court accepted its death-sentence recommendation.  *Ibid.*  Having exhausted his state-court appeals, Stojetz now brings this habeas corpus petition.  The district court denied the petition, and for the following reasons, we affirm.

I

A

On direct review, the Supreme Court of Ohio summarized the events surrounding Watkins's death:

> On April 25, 1996, appellant, John C. Stojetz, Jr., along with five other adult inmates, ran across the prison yard of Madison Correctional Institution and toward the Adams Alpha Unit ("Adams A"), which houses many of the state's juvenile offenders who had been tried as adults and convicted of criminal offenses.  Appellant and the other five inmates were each armed with knives commonly known as "shanks."  Appellant and the others entered the Adams A unit, circled the control desk, and held corrections officer Michael C. Browning at knifepoint.  Appellant then placed a shank to Browning's throat and ordered him to give appellant the keys that opened the cell doors of the Adams A unit. Browning threw the keys down and was allowed to flee the unit.

> Corrections officers immediately responded to Browning's "man down" alarm and converged on Adams A.  Officers were able to observe appellant and the other five inmates carrying shanks.  The corrections officers, armed only with pepper mace, attempted to enter Adams A.  However, appellant and the other inmates, wielding shanks, prevented the officers from entering.

Once inside Adams A, appellant and his accomplices proceeded to cell number 144, the cell of Damico Watkins, a seventeen-year-old juvenile inmate. Using the keys taken from Browning, appellant unlocked Watkins's cell and appellant and the other adult inmates entered the cell and began attacking Watkins. After eluding the initial attack and escaping from his cell, Watkins was pursued throughout the Adams A unit and repeatedly stabbed by appellant and the other shank-wielding inmates. Watkins was able to escape his attackers several times only to be again cornered and subjected to repeated stabbings. Eventually, Watkins was cornered by appellant on the second floor of the Adams A unit. As Watkins pleaded for his life, appellant and inmate Bishop repeatedly stabbed Watkins and left him for dead.

During the attack on Watkins, correction officers had surrounded the exterior of the Adams A unit. Deputy Warden Mark Saunders arrived on the scene and began conversing with the inmates who had taken over Adams A. During this conversation, inmate Lovejoy stated that "they [the inmates who had taken over Adams A] would not cell with black inmates." Also during the conversation, appellant stated, "we took care of things because you [prison officials] wouldn't."

Subsequently, the inmates were ordered to surrender. The prison yard was cleared and appellant and the five perpetrators passed their shanks through a window in the foyer of Adams A. Once prison officials retrieved the weapons, appellant and the other adult inmates exited the Adams A unit and surrendered to prison authorities.

After prison authorities regained control of the Adams A unit, the coroner arrived at the scene and declared Watkins dead.

*Ibid.* (alterations in original).

In October 1996, a Madison County, Ohio grand jury indicted Stojetz for purposely causing the death of Watkins with prior calculation and design, in violation of O.R.C. § 2903.01, and for the death-penalty specification of committing aggravated murder while a prisoner in a detention facility. *Ibid.* At trial, prosecutors introduced evidence indicating that Stojetz "was known to be the head of the 'Aryan Brotherhood' gang at the Madison Correctional Institution[,]" that he "and other members of the Aryan Brotherhood did not want to be housed in the same cells as black inmates[,]" and that he "and members of the Aryan Brotherhood wanted to be transferred from Madison Correctional to other penal institutions." *Ibid.* For instance, a subsequent search of the attackers' prison cells showed that they had already packed their belongings, *ibid.*, presumably in anticipation of a transfer. On April 8, 1997, the jury convicted Stojetz of aggravated murder while a prisoner in a detention facility. Nine days later, on April

17, it recommended a death sentence, which the trial court imposed. During the intervening decades, Stojetz has filed numerous appeals and motions, changed attorneys on multiple occasions, and raised an extraordinary number of claims.

Represented by new counsel on direct appeal, Stojetz asserted nineteen "propositions of law" for relief, nine of which are relevant here:

### PROPOSITION OF LAW NO. I

During jury selection in a capital case, the trial court must ask each prospective sentencing juror whether the juror's views on the death penalty would prevent or substantially impair the juror's ability to consider a life sentence if the defendant is found guilty of aggravated murder and the aggravating circumstance. Life qualification of each prospective juror is required whenever the trial court death qualifies the jurors by asking them if their views on the death penalty would prevent or substantially impair their ability to consider the death penalty in the case before them.

### PROPOSITION OF LAW NO. II

John Stojetz's death sentence is inappropriate. Damico Watkins['s] death resulted from his own threats against Stojetz and Stojetz's post-traumatic stress disorder.

### PROPOSITION OF LAW NO. III

When trial counsel fail to conduct an adequate voir dire, fail to object to inadmissible evidence, fail to request a separation of witnesses, fail to conduct an adequate investigation of the case, fail to object to victim impact evidence, present a confusing explanation of the mitigation weighing process, fail to adequately present evidence of a capital defendant's post-traumatic stress disorder, and fail to adequately prepare defendant's mitigation expert, a capital defendant is deprived of the right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

### PROPOSITION OF LAW NO. IV

A capital defendant is denied his rights to a jury verdict, to a fair trial, to due process, to the effective assistance of counsel, and to a reliable and non[-]arbitrary death sentence when the jury returns a general verdict of guilty for aggravated murder without a unanimous finding that the defendant was either the principal offender or an aider and abettor. U.S. Const. Amend. VI, VIII, XIV; Ohio Const. Art. I, §§ 5, 9, 10, 16.

## PROPOSITION OF LAW NO. V

The defendant who is death-eligible as either a principal offender or aider and abettor must have access to the grand jury's testimony [*sic*] when there are five co-defendants and the defendant shows a particularized need for their testimony. U.S. Const. Amend. XIV; Ohio Const. Art. I, § 16.

. . .

## PROPOSITION OF LAW NO. VIII

Appellant's right to due process is violated when the trial court admits improper testimony in violation of the Fourteenth Amendment to the United States Constitution and § 16, Article I, of the Ohio Constitution.

. . .

## PROPOSITION OF LAW NO. XI

When prosecutors misrepresent witness testimony, argue victim impact evidence unrelated to the offense, deny a defendant individualized sentencing, mislead on the definition of mitigation, and shift the burden of proof to the defendant, a capital defendant is denied his substantive and procedural due process rights to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 9, 16, and 20 of the Ohio Constitution. He is also denied his right to reliable sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

## PROPOSITION OF LAW NO. XII

A jury instruction that shifts the burden of proof on the *mens rea* element of aggravated murder to the accused is unconstitutional. U.S. Const. Amend. XIV; Ohio Const., Art. I, § 16. A jury instruction that makes the accused's guilt or innocence the ultimate issue of fact is also unconstitutional. U.S. Const. Amend. XIV; Ohio Const., Art. I, § 16.

. . .

## PROPOSITION OF LAW NO. XVI

When the trial court considers public policy matters, treats an institutional killing as requiring a mandatory death sentence, fails to weigh relevant mitigating evidence, and uses inappropriate standards in weighing proper mitigating evidence, a capital defendant is deprived of the right to individualized sentencing and of his liberty interest in the statutory sentencing scheme thus violating rights guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I, of the Ohio Constitution.

*Id.* at 347–48 (alterations in original).  On February 17, 1999, after a careful review of the record, the Supreme Court of Ohio affirmed Stojetz's conviction and sentence.  *Id.* at 335.  Two weeks later, Stojetz filed a motion for reconsideration with the Supreme Court of Ohio, in which he re-raised the first, third, and fifteenth propositions of law.  On April 7, 1999, his motion was denied.  *State v. Stojetz*, 708 N.E.2d 212 (Table) (Ohio 1999).

With the assistance of yet different counsel—by now, John J. Gideon represented the Appellant—Stojetz next filed an application to reopen his direct appeal on the grounds that appellate counsel had been constitutionally ineffective.  Specifically, Stojetz alleged that counsel had been ineffective because they had not included the following propositions of law in the appellate brief:

### PROPOSITION OF LAW NO. I

Trial counsel render[ed] ineffective assistance of counsel under the Sixth Amendment to the United States Constitution by failing to object to the admission of the hearsay testimony of a corrections officer that juvenile inmates were yelling from their cells that the defendant was a murderer.

### PROPOSITION OF LAW NO. II

Trial counsel render[ed] ineffective assistance of counsel under the Sixth Amendment to the United States Constitution by failing to object to prosecutorial misconduct: (i) in misrepresenting testimony in trial phase closing argument; (ii) in drawing extraneous comparisons between the defendant and others and arguing public policy during sentencing phase closing argument; (iii) in misleading the jury on the definition of "mitigation" during sentencing phase closing argument; and (iv) in shifting the burden of proof to the defendant during sentencing phase closing argument.

### PROPOSITION OF LAW NO. III

Trial counsel render[ed] ineffective assistance of counsel under the Sixth Amendment to the United States Constitution by failing to object to the admission of a crime scene videotape and for failing to object to the replaying of the videotape during trial phase deliberations.

While this application was pending, Stojetz also filed a petition with the Supreme Court of the United States for a writ of certiorari to the Supreme Court of Ohio regarding its denial of his direct appeal.

On August 18, 1999, the Supreme Court of Ohio denied Stojetz's application to reopen his direct appeal. 714 N.E.2d 932 (Table) (Ohio 1999). Nearly three months later, on November 8, 1999, the Supreme Court of the United States denied Stojetz's petition for a writ of certiorari. *Stojetz v. Ohio*, 528 U.S. 999 (1999).

B

i. Petition for Postconviction Relief

In March 1998, while Stojetz's direct appeal was pending, attorney Gideon also filed a petition for postconviction relief. Initially, Stojetz listed six grounds for relief, but he amended the petition five times to raise the total to eleven:

**First Ground for Relief**

Actual Innocence.

**Second Ground for Relief**

Ineffective Assistance of Counsel with Respect to Pretrial Publicity.

**Third Ground for Relief**

Ineffective Assistance of Counsel with Respect to Trial Publicity.

**Fourth Ground for Relief**

Ineffective Assistance of Counsel in Failing to Investigate and Present a Defense.

**Fifth Ground for Relief**

Ineffective Assistance [of Counsel] in Failing to Call Witnesses.

**Sixth Ground for Relief**

Withholding of Evidence.

**Seventh Ground for Relief**

Denial of Petitioner's Right to Testify.

**Eighth Ground for Relief**

Ineffective Assistance of Counsel for Failing to Advise Petitioner of His Right to Testify and for Failing to Call Petitioner to Testify.

**Ninth Ground for Relief**

Ineffective Assistance of Counsel for Failing to Present Evidence to Rebut Prosecution Attempt to Portray Incident as Racist.

**Tenth Ground for Relief**

Ineffective Assistance of Counsel for Failing to Present Mitigating Evidence that the Victim Induced the Offense and that Petitioner Was Provoked.

**Eleventh Ground for Relief**

Ineffective Assistance of Counsel for Failing to Move for a Separation of Witnesses.

The trial court conducted an evidentiary hearing and, on September 14, 2000, denied relief.

On October 13, 2000, Stojetz filed a notice of appeal. Gideon subsequently filed multiple motions requesting additional time—once to complete the record and thrice to file his brief—as well as a motion for leave to file a brief exceeding the page limit established by the Ohio Rules of Appellate Procedure and the Local Rules of the Twelfth Appellate District. He did not, however, file a brief within the time permitted; as a result, on September 10, 2001, a show-cause order was issued, directing Stojetz to explain in writing why his appeal should not be dismissed. After Gideon explained that the lapse was due to a clerical error, Stojetz was granted additional time and directed to file his brief by October 15, 2001. Gideon failed to do so, however, and on January 10, 2002, the Court of Appeals of Ohio dismissed Stojetz's postconviction appeal with prejudice. In February 2002, the state appellate court denied Stojetz's request to reopen the appeal and to permit substitution of counsel.

After obtaining new counsel—specifically, the Ohio Public Defender's Office—Stojetz appealed the state appellate court's decision, raising four more propositions of law:

**PROPOSITION OF LAW NO. I**

When a capital appellant demonstrates that post-conviction counsel, due to apparent mental illness, failed to file his merit brief[,] the appellate court must re-open that appellant's direct appeal. Failure to do so violates the appellant's rights to effective assistance of counsel, due process of law, equal protection of the law, confrontation of the state's evidence against him, and freedom from cruel and unusual punishment. U.S. Const. Amends. V, VI, VIII, IX, and XIV; Ohio Const. Art. I, §§ 1, 2, 5, 9, 10, 16, 20.

**PROPOSITION OF LAW NO. II**

Where the evidence adduced at a post-conviction evidentiary hearing, in conjunction with post-conviction exhibits, showed that Stojetz was denied his right to the effective assistance of counsel, the trial court must grant relief on the

post-conviction petition.  U.S. Const. Amends. VI, XIV; Ohio Const. Art. I, §[§] 1, 10, 16.

**PROPOSITION OF LAW NO. III**

A defendant who is actually innocent of the death penalty may not be executed. U.S. Const. Amends. VIII, XIV; Ohio Const., Art[.] I, §§[]1, 10, 16.

**PROPOSITION OF LAW NO. IV**

When a post-conviction petitioner demonstrates the state withheld material, exculpatory evidence, the trial court must reverse the petitioner's conviction and sentence.  U.S. Const. Amends. V, XIV; Ohio Const. Art. I, § 16.

Nevertheless, on May 15, 2002, the Supreme Court of Ohio declined to hear the appeal, stating that it did not involve any substantial constitutional question.  *See State v. Stojetz*, 767 N.E.2d 1177 (Table) (Ohio 2002).

## ii. Motion for a New Trial

Concurrent to the above proceedings, in April 2000, Stojetz also filed a motion for a new trial based upon newly discovered evidence.  That evidence consisted of the deposition and trial testimony of an accomplice, which allegedly showed that Stojetz had been provoked and had only planned to fight—rather than kill—Watkins and, thus, that trial counsel were constitutionally ineffective for failing to investigate and present such evidence.  On March 18, 2002, after the state appellate court had denied Stojetz's motion to reopen his postconviction appeal, the trial court denied the motion for a new trial, noting that the accomplice "was not a major offender, . . . had a limited view of the events as they unfolded[,] and . . . had no relevant discussions with defendant Stojetz prior to the takeover."  On appeal of that denial, Stojetz raised two assignments of error:

**Assignment of Error No. 1**

The trial court erred in denying appellant Stojetz's motion for a new trial.

**Assignment of Error No. 2**

The trial court erred in failing to find counsel rendered ineffective assistance of counsel.

*State v. Stojetz*, No. CA2002-04-006, 2002 WL 31682231, at *2, *5 (Ohio Ct. App. Dec. 2, 2002). The Court of Appeals of Ohio affirmed the trial court's decision, *id.* at *6, and the Supreme Court of Ohio declined to review, *State v. Stojetz*, 786 N.E.2d 63 (Table) (Ohio 2003).

### iii. Second Petition for State Postconviction Relief and Other Motions

Nearly six years later, while his federal habeas petition was pending before the district court, *see infra* Part I.C, Stojetz filed in state court a second petition for postconviction relief, an application for leave to file a motion for a new trial, and a motion for discovery. *State v. Stojetz*, No. CA2009-06-013, 2010 WL 2252191, at *1 (Ohio Ct. App. June 7, 2010). At that time, Stojetz raised three new claims based upon an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963), specifically, the State's failure to disclose medical records in the possession of the Ohio Department of Rehabilitation and Correction:

> **First Claim for Relief**
>
> Stojetz's sentence is void or voidable because the trial prosecutors suppressed material exculpatory and impeaching evidence, in violation of Stojetz's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
>
> **Second Claim for Relief**
>
> Stojetz's judgment and sentence are void or voidable because the prosecutor knowingly presented false evidence.
>
> **Third Claim for Relief**
>
> Stojetz's judgment and sentence are void or voidable because the prosecutor committed acts of misconduct during the penalty phase of Stojetz's capital trial.

*Stojetz v. Ishee*, No. 2:04-cv-263, 2014 WL 4775209, at *4–5 (S.D. Ohio Sept. 24, 2014). The state trial court dismissed Stojetz's second postconviction petition as time-barred, finding that he had failed to establish that (1) he was unavoidably prevented from discovering the facts upon which the petition relied and (2) but for constitutional error at sentencing, no reasonable factfinder would have found him eligible for the death penalty. For similar reasons, the trial court also overruled Stojetz's application for leave to file a motion for a new trial. Stojetz's motion for discovery was also denied. *Id.* at *5.

Stojetz appealed the postconviction trial court's decision, and before the Court of Appeals of Ohio, he raised the following assignments of error:

**Assignment of Error I**

The trial court violated Appellant's due process rights when it denied his successor post-conviction petition as time-barred. [U.S. Const. amend. XIV.]

    1. The requirements of O.R.C. § 2953.23 for successive petitions should not apply to Appellant's second in time petition.

    2. Appellant satisfied the statutory requirements for a successive petition on each of his three grounds for relief.

**Assignment of Error II**

The trial court violated Appellant's due process rights when it denied his request to file a new trial motion. [U.S. Const. amend. XIV.]

    1. Appellant was unavoidably prevented from discovering his new evidence within one-hundred and twenty days of the jury verdict under Criminal Rule 33(B) and O.R.C. § 2945.80.

**Assignment of Error III**

The trial court violated Appellant's due process rights when it denied his motion for discovery. [U.S. Const. amend. XIV.]

    1. Appellant's post-conviction claims warranted discovery.

*Ibid.* Once again, the Court of Appeals of Ohio affirmed the trial court's decision, *Stojetz*, 2010 WL 2252191, at *6, the Supreme Court of Ohio declined to accept jurisdiction, *State v. Stojetz*, 981 N.E.2d 884 (Table) (Ohio 2013), and the Supreme Court of the United States denied a petition for a writ of certiorari, *Stojetz v. Ohio*, 134 S. Ct. 514 (2013).

C

While all this was occurring, on April 1, 2004, Stojetz also filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he raised eighteen claims for relief. In September 2005, the district court dismissed as procedurally defaulted a number of those claims and subclaims. *Stojetz*, 2014 WL 4775209, at *1. Then, on September 24, 2014, the court denied Stojetz's remaining claims in their entirety and dismissed the habeas corpus action with prejudice. *Id.* at *139. In doing so, however, the district court granted Stojetz a Certificate of Appealability on all or portions of six of those claims, which we expanded to include two additional ineffective-assistance-of-trial-counsel claims.

Stojetz's pendent claims for habeas relief are as follows:

### Claim I

Ineffective trial counsel failed to voir dire jurors in an inter-racial crime, where race was an alleged motive, the defense related to race, and Stojetz was a member and alleged leader of a race-hate prison gang.

### Claim II

The district court erred when it denied Stojetz expanded discovery and then dismissed his ninth and tenth claims where it found that the State's withholding of documented evidence that Stojetz had been assaulted while in the custody of the Ohio Department of Rehabilitation and Corrections [*sic*] was not sufficient to establish a *Brady* violation or deprivation of due process of law and equal protection of the law.

### Claim III

Trial counsel were ineffective at the guilt and penalty phases when they failed to investigate and present available evidence in support of their defense.

### Claim IV

Ineffective trial counsel failed to conduct or request voir dire of jurors regarding exposure to publicity during trial.

### Claim V

Trial counsel were ineffective in failing to object to improper instructions and prosecutorial misconduct.

### Claim VI

Trial counsel were ineffective during voir dire when they failed to life qualify the jury and through the commission of other errors.

### Claim VII

Ineffective trial counsel failed to object to evidence that was fundamentally unfair—opinion evidence on intent and specific intent.

### Claim VIII

The district court erred in not reconsidering its procedural defaults under *Maples v. Thomas*, [565 U.S. 266 (2012)].

### Claim IX

The district court abused its discretion in not allowing access to the grand jury transcripts.

**Claim X**

Stojetz is actually innocent—he is not the hands on killer—and his death sentence is arbitrary and capricious.

Appellant Br. iii-v.

To aid with the analysis, we will group together those claims whose underlying issues are similar and will address them in a different order than Stojetz presented them.

II

When reviewing a district court's grant or denial of a petition for a writ of habeas corpus, we review its factual findings for clear error and its legal conclusions de novo. *Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014). Because Stojetz filed his petition in 2004, it is also subject to the strictures of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009), which restricts this court's role in reviewing state prisoner applications, *see Bell v. Cone*, 535 U.S. 685, 693 (2002).

Under AEDPA, a writ of habeas corpus on behalf of a state prisoner may be granted only under highly limited circumstances. First, a strict one-year statute of limitations applies to any application for such a writ, running from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). This statute of limitations is, however, tolled while a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending[.]" *Id.* § 2244(d)(2).

Second, even if the petition is not time-barred, AEDPA makes clear that except under certain conditions that do not obtain here, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall . . . be granted [only if] it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" *Id.* § 2254(b)(1)(A). This exhaustion requirement can be satisfied in two ways. First, it is met if "the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). Second, "[b]ecause the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' [it is satisfied when] a petitioner['s] . . . claims are barred by *res judicata*, and are thus procedurally defaulted[.]" *Hand v. Houk*, 871 F.3d 390, 407 (6th Cir. 2017) (quoting *Gray v. Netherland*, 518 U.S. 152, 161 (1996)).

To prevent habeas petitioners from circumventing the exhaustion requirement by defaulting their federal claims in state court, we do not consider claims that have been defaulted pursuant to an independent and adequate state procedural rule unless the petitioner can show cause and prejudice for the default. *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *Hand*, 871 F.3d at 407. A four-step inquiry guides this determination:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural ground is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim . . . . Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Stone v. Moore*, 644 F.3d 342, 346 (6th Cir. 2011) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). To inform this inquiry, "we look to the 'last explained state court judgment[]' to determine whether relief is barred on procedural grounds." *Stone*, 644 F.3d at 346 (quoting *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004)).

Ohio's bifurcated system of appellate review complicates the application of the *Maupin* test to this case. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 751 (6th Cir.

2013) ("Ohio law appears to contemplate two kinds of [appellate] claims, those based only on evidence in the trial record and those based in part on evidence outside the record."). In Ohio, claims based entirely on evidence contained in the trial record must be raised on direct appeal or else they are waived. *Hand*, 871 F.3d at 408. However, if a claim involves evidence from outside the trial record, it may be raised for the first time in a petition for state postconviction relief. *See State v. Cole,* 443 N.E.2d 169, 171 (Ohio 1982) ("Generally, the introduction in [a state postconviction] petition of evidence *dehors* the record . . . is sufficient, if not to mandate a hearing, at least to avoid dismissal on the basis of *res judicata*."). As such, when applying *Maupin* to a habeas corpus petition for a person in custody pursuant to an Ohio state-court judgment, one must be careful to examine the evidentiary basis for each claim.

Third, even if a petitioner's claims are not procedurally defaulted, AEDPA limits the circumstances under which we may grant a writ with respect to any claim that was adjudicated on the merits in a State court proceeding. Specifically, AEDPA directs us not to grant a writ of habeas corpus unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's adjudication of a claim is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014) (citing *Brown v. Payton*, 544 U.S. 133, 141 (2005)). In contrast, a state court's decision involves an "unreasonable application" of federal law when "the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007) (citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). For the purposes of § 2254(d)(1), "clearly established federal law" includes only the holdings of the Supreme Court, excluding any dicta; and an application of these holdings is "unreasonable" only if the petitioner shows that the state

court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Clear error does not suffice. *Woodall*, 134 S. Ct. at 1702.

When making these determinations, we "apply a presumption of correctness to state court findings of fact . . . unless clear and convincing evidence is offered to rebut this presumption." *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)). Furthermore, "[t]rial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo*, 365 F.3d at 494 (citing *Estelle v. McGuire*, 502 U.S. 62, 69–70 (1991)). Lastly, our review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

III

Because the majority of Stojetz's claims concern the constitutional effectiveness of trial counsel, and because those claims are assessed using the same analytic rubric, we will discuss them together. More specifically, in this section, we will consider Stojetz's claims that trial counsel were ineffective for failing to: (1) question prospective jurors about their views on race, life qualify the jury, and accurately describe the nature of mitigating evidence during voir dire (Claims I and VI); (2) investigate and present available evidence at both the guilt and penalty phases (Claim III); (3) request voir dire of jurors concerning their exposure to publicity during the trial (Claim IV); (4) object to allegedly improper jury instructions and to incidents of prosecutorial misconduct (Claim V); and (5) object to opinion evidence regarding, *inter alia*, Stojetz's intent at the time of the incident (Claim VII).

To establish ineffective assistance of trial counsel, a defendant must make two showings. First, he must demonstrate that counsel's performance was objectively deficient, i.e., that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Review of counsel's performance is "highly deferential," meaning that we "indulge a strong presumption that [his or her] conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. A defendant alleging ineffective assistance of counsel must therefore first "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Ibid.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Second, the defendant must demonstrate that counsel's errors prejudiced the defense, i.e., that the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Except for circumstances that are not relevant here, this requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.*

Because AEDPA applies to this case, establishing ineffective assistance of counsel is all the more difficult for Stojetz. Where the Supreme Court of Ohio has adjudicated Stojetz's ineffective-assistance claims, the question is not simply whether the defendant had met his burdens under *Strickland*. *Richter*, 562 U.S. at 105. Rather, when § 2254(d) applies, the question is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Ibid.*

A

Because Stojetz's first and sixth claims concern alleged deficiencies during the jury-selection process, we will group them together.

i

Stojetz's first claim—that counsel were ineffective for failing to question prospective jurors about their views on race—was rejected by the Supreme Court of Ohio, albeit without discussion. *Stojetz*, 705 N.E.2d at 337. Because the Supreme Court of Ohio rejected this allegation on the merits, *see Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary"), the district court limited its inquiry to whether the Supreme Court of

Ohio's decision contravened or unreasonably applied clearly established federal law, namely *Strickland*, *Stojetz*, 2014 WL 4775209, at \*69. The district court correctly determined that it did not.

As noted earlier, to succeed on an ineffective-assistance-of-counsel claim, a petitioner must overcome the presumption that the challenged action might have constituted sound trial strategy and show that he was prejudiced by his counsel's alleged deficiencies. *Strickland*, 466 U.S. at 687, 689. Stojetz carries neither burden. Most obviously, Stojetz fails to satisfy *Strickland*'s prejudice requirement as he offers no evidence whatsoever to suggest that an impaneled juror was biased against those who belong to a race-based gang and have been charged with an inter-racial crime. Only slightly less obvious, Stojetz does not offer any evidence to rebut the presumption that counsel were pursuing a sound trial strategy, viz., minimizing discussions of race and racial animus. "It . . . go[es] without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (second alteration in original) (quoting *Strickland*, 466 U.S. at 689).[1] Accordingly, there is no basis for concluding that trial counsel were ineffective in failing to question potential jurors regarding their views on race, let alone that the Supreme Court of Ohio's resolution of this matter was unreasonable.

Despite these lacunae in his argument, Stojetz contends that counsel were per se ineffective because *Turner v. Murray*, 476 U.S. 28 (1986), imposes a duty on trial counsel to "address[] racial bias in an inter-racial crime in a capital case." Appellant Br. 17. He is mistaken. In *Turner*, the Supreme Court stated that while:

> a capital defendant accused of an interracial crime is entitled to have prospective
> jurors . . . questioned on the issue of racial bias . . . [the] defendant cannot

---

[1]This is particularly true where, as here, the evidence supports the presumption that counsels' actions were informed by their trial strategy. At a state postconviction evidentiary hearing, one of Stojetz's trial counsel testified that "the defense theory was that Mr. Stojetz . . . went to Adams A basically to do some corrective action and that it got out of hand." He further stated that the theory had been adopted "[a]fter talking with [Stojetz] and look[ing] over the evidence that we had to deal with." Given this strategy, and given Stojetz's insistence that race had nothing to do with the incident, counsel may very well have thought it imprudent to draw attention to the issue of race.

complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry.

*Turner*, 476 U.S. at 36–37 (citation and footnote omitted).   *Turner* is therefore inapposite because it imposes a *conditional* obligation on the trial *court*.   Stojetz's per se ineffectiveness claim is therefore unfounded.

ii

Stojetz's sixth claim details two more ways in which trial counsel were allegedly ineffective during voir dire: (1) failing to life qualify the jury and (2) mischaracterizing the nature of mitigating evidence.  Stojetz grounds the former subclaim on trial counsels' having not fulfilled their alleged duty "to request or to examine . . . the jurors to ensure they would not preclude consideration of a life sentence."  Appellant Br. 118.  He supports the latter subclaim by citing specific instances where counsel mischaracterized the nature of mitigating evidence. *Id.* at 119.  Specifically, Stojetz highlights counsels' description of mitigating evidence as a form of "excuse," their statement that "[w]hatever evidence we offer would have to transcend or be more serious, more forgivable than the evidence put on by the State," and their "enter[ing] into a dialogue with [prospective jurors] on self-defense as mitigation" even though "self-defense was not a factual or legal defense in this matter[.]" *See id.* at 119, 121.  Because the Supreme Court of Ohio denied both subclaims on the merits, *Stojetz*, 705 N.E.2d at 337, the question before us is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," *Richter*, 562 U.S. at 105.  The district court correctly determined that there was. *Stojetz*, 2014 WL 4775209, at *42–43.

For starters, there is simply no merit to Stojetz's argument that *Morgan v. Illinois*, 504 U.S. 719 (1992), requires trial counsel to life qualify jurors in a death-penalty case.  In *Stanford v. Parker*, 266 F.3d 442 (6th Cir. 2001), we stated that "*Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case.  Instead, *Morgan* holds that a defendant has the right to life-qualify his jury upon request." *Id.* at 454.  Because *Morgan* recognized a conditional duty on the trial court, we concluded that "[p]ursuant to *Morgan*, failure to life-qualify a jury is not per se ineffective assistance of counsel." *Ibid.*

Nor does Stojetz furnish any other basis for concluding that counsels' performance was deficient. In *Stanford*, we noted that there exists a "presumption that . . . counsel's failure to ask life-qualifying questions during general voir dire constitute[s] trial strategy." *Ibid.* As such, where a defendant "presents no evidence to counteract [this] presumption . . . [and t]he record is silent as to the rationale behind his counsel's performance[,]" an ineffective-assistance-of-counsel claim must be rejected under *Strickland*'s performance requirement. *Id.* at 454–55.

Stojetz's selective quoting of the voir dire transcript gives us no reason to abandon this presumption. As the Supreme Court of Ohio noted, none of the jurors identified in Stojetz's brief indicated that they were unwilling to consider a sentence other than death. *Stojetz*, 705 N.E.2d at 336. Jurors Coffin, Hirst, and Banion—whom Stojetz identifies as having never been asked about their willingness to consider a life sentence—either expressed reservations over the imposition of the death penalty or acknowledged at least one circumstance where it would not be warranted. Juror Banion, for instance, stated, "there's times I'm kind of for the death penalty but I just don't want to be the one that says, you know." Stojetz's counsel therefore had no need to ask life-qualifying questions, which in turn means that we must assume that counsels' failure to do so constituted trial strategy. We therefore reject Stojetz's failure-to-life-qualify subclaim.

Stojetz's remaining subclaim—that trial counsel were ineffective because they mischaracterized the nature of mitigating evidence during voir dire—is likewise meritless. First, while self-defense was not a legal *defense* in this matter, "inducement" is a statutory mitigating factor in Ohio. O.R.C. § 2929.04(B)(1). Given, furthermore, that counsel highlighted inducement as a mitigating factor during the trial's sentencing phase—viz., that Watkins had brought about his own death by first attacking a friend of Stojetz and by then planning to attack Stojetz, and that Stojetz construed this plot as a viable threat—counsels' discussion of self-defense appears to have been designed to impanel a jury that would look favorably upon their mitigation argument. At the very least, we have no reason to reject "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel*, 350 U.S. at 101). Second, while trial counsel undoubtedly erred when they suggested that the mitigating factors had to outweigh the aggravating circumstances, Stojetz does not show that he was prejudiced by this error. Immediately before

and after this misstatement, counsel correctly stated that the burden was on the State to overcome the mitigating evidence. Moreover, the trial court properly instructed the jury on multiple occasions regarding the correct standard, including at the start of and during the penalty phase of the trial. Because an isolated statement, said during voir dire, is not "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *Strickland*, 466 U.S. at 687, we cannot say that counsel were constitutionally ineffective for mischaracterizing the nature of mitigating evidence, let alone that the Supreme Court of Ohio's resolution of this matter was unreasonable.

B

In his third claim, Stojetz alleges that trial counsel were ineffective at both the guilt and penalty phases because they limited their investigation to a review of discovery documents provided by the State, as opposed to conducting an independent investigation. Specifically, Stojetz faults counsel for not interviewing corrections officers, his accomplices, and the juvenile inmates who were housed in Adams A at the time of the incident. Had counsel conducted those interviews, Stojetz contends, they would have discovered exculpatory and mitigating evidence that may have altered the outcome of the case. In support of this claim, Stojetz notes that when questioned by postconviction counsel, one of his accomplices—William Vandersommen— confessed to the murder, while another—James Bowling—corroborated that testimony, said that the group had not planned to kill Watkins, and stated that the attack was in response to a threat Watkins had made against Aryan Brotherhood members. Stojetz also points to three juvenile inmates as potential sources of favorable testimony. In postconviction depositions, David Hicks and Robert Sheets stated that they did not see Stojetz stab Watkins, while Kevin Fulkerson, who was not in Adams A at the time of the assault, testified that Stojetz knew that Watkins had been planning to attack Aryan Brotherhood members.

Stojetz raised this claim on direct appeal, albeit in limited form, and during his postconviction proceedings, as was proper. After the postconviction trial court denied the claim, Stojetz filed a notice of appeal. However, the Court of Appeals of Ohio dismissed the action after his postconviction counsel failed to file a brief. On federal habeas review, the State of Ohio initially argued that Stojetz had procedurally defaulted this claim, but later abandoned that

position. After an exhaustive review of the record, the district court denied relief. *Stojetz*, 2014 WL 4775209, at *13, *25–35.

The district court was correct to do so. In *Strickland*, the Supreme Court was clear that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. As such, when assessing a particular decision not to investigate, we must "directly assess[] [the decision] for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. Among the circumstances to be considered are the defendant's own statements or actions. *Ibid.* ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether."). Furthermore, even if counsel's actions were professionally unreasonable, they must have also prejudiced the defense to constitute constitutionally ineffective assistance. *Id.* at 691–92.

Reasonable professional judgments support trial counsels' investigatory decisions. As the postconviction trial court noted, prosecutors furnished Stojetz's trial counsel with "overwhelming substantive evidence" during discovery, specifically:

> the transcripts of inmate interviews, photographs, additional incident reports, defendant's record, the Ohio State Highway Patrol report with narrative supplement and witness interviews, victim information, certified copies of convictions, an adult parole authority report, institutional floor plan, crime scene log and photos and a list of 14 Highway Patrol witnesses. Additional summaries of inmate witnesses' testimony were provided [one week later].

Stojetz does not contest this. Nor does he contest the trial court's finding that those files included 65 transcripts of inmate interviews, at least thirty of whom saw Stojetz stabbing Watkins, carrying a knife, or leading the attackers. Were this not enough, trial counsel were also provided with "a video tape of the events as they occurred, a video tape of Watkins'[s] trail of blood as he tried to escape his execution, [and] lab reports that placed Watkins'[s] blood on [Stojetz's] clothing and shoes[.]" Given the mountain of evidence provided during discovery, it is simply not true that counsel "did nothing to investigate [the] theories or facts of Stojetz's case[.]" Appellant Br. 64.

Nor is it plausible to suggest that reasonably diligent counsel would have interviewed Stojetz's accomplices and the juvenile inmates who may have had first-hand knowledge of the attack. It stretches the imagination to believe that Stojetz's accomplices, if only they had been asked, would have testified to having committed a murder carrying a death specification. *See Stewart v. Wolfenbarger*, 468 F.3d 338, 352–53 (6th Cir. 2006) ("[I]t is highly speculative that [an accomplice] would have incriminated himself or otherwise cast suspicion on himself, while at the same time decreasing the suspicion on Petitioner, if he testified at Petitioner's trial."). Vandersommen acknowledged this reality in his deposition, stating that he "probably" would not have testified at Stojetz's trial because he "was still weighing the possibility of what [the authorities were] going to do to me[.]" The same is almost certainly true of Bowling, whose deposition testimony was provided nearly 2.5 years after Stojetz's conviction and only after he (Bowling) had been sentenced for his role in Watkins's murder. Trial counsels' decision not to interview Stojetz's accomplices is further supported by the fact that shortly after the incident each accomplice had signaled an unwillingness to be interviewed: each had refused to speak to investigators, and four of them requested an attorney. In light of these considerations, and applying a heavy dose of deference, we conclude that it was within the scope of reasonable professional judgment for trial counsel not to interview Stojetz's accomplices.

Likewise, reasonable professional judgments support trial counsels' decision not to interview inmates Hicks, Sheets, and Fulkerson. Stojetz omits that Hicks initially claimed not to have seen the incident while Sheets told investigators that he would not talk due to a fear of being hurt. Likewise, when questioned by investigators a few days after the murder, Fulkerson made no mention of his conversation with Stojetz. Faced with such investigative statements, a reasonable attorney would have no reason to interview either Hicks or Fulkerson. And even assuming, *arguendo*, that counsels' performance was deficient with respect to Sheets, Stojetz cannot show prejudice. It would be implausible for us to accept that Sheets's later statement—in which he also said that Stojetz was wielding a knife in Adams A—would have given rise to "a reasonable probability that . . . the result of the proceeding would have been different[,]" *Strickland*, 466 U.S. at 694. The evidence presented at trial establishing Stojetz's direct involvement in the attack was overwhelming, *see, e.g.*, *infra* Part III.E, as was the rebuttal evidence that the prosecution could have mustered—i.e., the dozens of juvenile eyewitnesses

whom it did not present at trial—had Sheets testified. *See Stojetz*, 2014 WL 4775209, at \*17 (noting that only three juvenile eyewitnesses testified at trial). Stojetz's third claim was therefore properly denied.

C

Stojetz's fourth claim—that counsel were ineffective for failing to request voir dire during the trial—centers around the publication of suppressed evidence in a local newspaper. On April 7, 1997, the Madison Press published an article in which Stojetz was reported to have said, "I don't know why they're trying to give me the death penalty . . . all I did was kill another inmate." Appellant Br. 84 (ellipsis in original). Although one of Stojetz's siblings brought the matter to the attention of his attorneys, trial counsel did not inquire into whether jurors had been exposed to and prejudiced by the coverage.

Stojetz first raised this claim during postconviction review, where it was denied on procedural and substantive grounds. With respect to the merits, the trial court found that counsels' failure to conduct voir dire on this issue did not constitute deficient performance as "jurors were admonished to insulate themselves from any outside knowledge" and "[a] jury is presumed to follow instructions of law[.]" The court also held that the failure to voir dire the jurors did not prejudice Stojetz's defense given that "[t]he evidence presented in the courtroom overwhelmingly established defendant's guilt." Because the Court of Appeals of Ohio dismissed Stojetz's postconviction appeal for failure to timely file a brief, and because the Supreme Court of Ohio declined jurisdiction, the postconviction trial court was the last state court to issue a reasoned decision addressing Stojetz's publicity claim. On federal habeas review, the district court denied Stojetz's claim, holding that the trial court's decision was not unreasonable within the meaning of 28 U.S.C. § 2254(d). *Stojetz*, 2014 WL 4475209, at \*78.

Although some question exists as to whether this claim was procedurally defaulted, we need not resolve that issue here; that is because Stojetz's ineffective-assistance-of-counsel claim is frivolous. In *United States v. Metzger*, 778 F.2d 1195 (6th Cir. 1985), we explained that:

> "[w]here a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated that admonition." . . . Thus, even when material presented by the news

media is prejudicial to the defendant, absent a showing that the jury violated the admonishment, a conviction will not be reversed.

*Id.* at 1209 (alteration in original) (quoting *Rizzo v. United States*, 304 F.2d 810, 815 (8th Cir. 1962)). Here, the court delivered such a warning at the end of the last trial day before the article's publication:

> [i]t is particularly important when you separate for the weekend again that you have no discussions, insulate yourselves from anybody else's discussions. Go home and stay at home and keep the TV off, don't look at the newspapers and we'll see you next Monday morning at nine o'clock.

It must therefore be presumed that no juror read the offending article unless Stojetz produces some evidence to the contrary. He does not. Accordingly, Stojetz does not overcome the presumption that trial counsels' decision not to conduct voir dire on this matter constituted sound trial strategy, namely, to avoid drawing jurors' attention to an article that counsel may not have wanted jurors to see. For this reason, Stojetz does not show that counsels' performance was deficient, let alone that the postconviction trial court's determination was unreasonable.

D

Stojetz's fifth claim details three more ways in which his trial counsel are alleged to have been constitutionally ineffective: (1) for failing to object to jury instructions that violated *Tison v. Arizona*, 481 U.S. 137 (1987); (2) for failing to object to jury instructions that violated *Sandstrom v. Montana*, 442 U.S. 510 (1979); and (3) for not objecting to instances of prosecutorial misconduct, namely, (i) references to victim-impact evidence during the guilt phase of the trial, (ii) comments during the trial's sentencing phase that compared Stojetz to his siblings, that improperly defined "mitigation," and that misstated the burden of proof, and (iii) the improper use of peremptory challenges to exclude women from the jury. To facilitate the analysis of this claim, we will consider each subclaim separately.

i

Stojetz's first subclaim centers around the propriety of the following guilt-phase instruction:

> You may find the defendant guilty of aggravated murder whether he participated as a principal or aider and abettor if he specifically intended to kill and you are satisfied beyond a reasonable doubt of his guilt.

> If you find that the state produced evidence which convinces you beyond a reasonable doubt of each and every element of aggravated murder whether you find the defendant a principal or aider and abettor, return a verdict of guilty to the charge of aggravated murder.

Appellant Br. 90–91. Stojetz argues that such instructions were improper—and, thus, that trial counsel should have objected to them—because they "violate[d] [his] right to a jury determination on every element of the offense." *Id.* at 91.

It is unclear whether this is the same claim that Stojetz raised on direct appeal. At that time, Stojetz merely argued that "[e]ffective counsel would have ensured that [the] jury unanimously agreed that [he] was guilty as either a principal offender or as an aider and abettor." To the extent that Stojetz is restating this claim, it was rejected on the merits by the Supreme Court of Ohio, *Stojetz*, 705 N.E.2d at 337, and denied by the district court, *Stojetz*, 2014 WL 4775209, at *47. Given that neither state law nor federal law imposes the requirement alleged by Stojetz, *see Schad v. Arizona*, 501 U.S. 624, 631–32 (1991), the district court was correct to find that the Supreme Court of Ohio's decision was neither contrary to nor involved an unreasonable application of clearly established federal law, *Stojetz*, 2014 WL 4775209, at *46.

Stojetz's claim seems, however, to have shifted before this court. Rather than simply asserting that juries must be unanimous in their finding of a defendant's role in an offense, Stojetz now emphasizes that "the jury never made the factual determination of death eligibility required under *Tison*[.]" Appellant Br. 91. It therefore appears that Stojetz is now arguing that the instruction was improper—and, thus, that his counsel were ineffective for failing to object to it—because (1) it permitted him to be convicted as an accomplice and (2) "[a]bsent the *Tison* finding, [he] was ineligible for the death penalty." *Id.* at 92.

Accepting this alternative construal of Stojetz's claim—and setting aside the question of whether it was procedurally defaulted—it too is meritless given the content of the instruction. *Tison* is a refinement of *Enmund v. Florida*, 458 U.S. 782 (1982), in which the Supreme Court held that the Eighth Amendment does not permit a death sentence for one who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797. As such, a *Tison* finding is required only where a defendant may be convicted as an aider-and-abettor who lacks the requisite intent. This is not such a case. Here, the jury was instructed, "[y]ou may find the defendant guilty of aggravated murder whether he participated as a principal or aider and abettor *if he specifically intended to kill* and you are satisfied beyond a reasonable doubt of his guilt." Appellant Br. 90–91 (emphasis added). There was no reason for trial counsel to object to these instructions, therefore, because *Enmund* was not implicated. Accordingly, trial counsels' performance cannot have been deficient in the manner alleged.

ii

Stojetz next argues that trial counsel were ineffective because they "failed to object to an improper guilt phase instruction that presumed purpose from an intent to kill." *Id.* at 93. Though the target of Stojetz's objection is, once again, less than clear, he later states that the jury instructions were improper because they "create[d] a conclusive presumption that, since a deadly weapon was involved, or that it was reasonably foreseeable, or that it was not an accident, Stojetz's purpose and specific intent had been established." *Id.* at 96. He therefore appears to be objecting to the following instruction:

> [i]f a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause death may be nonconclusively inferred from the use of a weapon. No person may be convicted of aggravated murder unless he specifically intended to cause the death of another.

On direct appeal, the Supreme Court of Ohio denied the claim without elaboration. *Stojetz*, 705 N.E.2d at 337. Likewise, the district court denied the claim, finding that "the culpability-phase jury instructions as a whole unmistakably conveyed to the jury the requisite mental state for the crime of aggravated murder." *Stojetz*, 2014 WL 4775209, at *49.

No relief is warranted as the trial court's instruction did not create either a conclusive or burden-shifting presumption in violation of *Sandstrom*.  The problem in *Sandstrom*, the Court explained, was that:

> jurors were told that "[t]he law *presumes* that a person intends the ordinary consequences of his voluntary acts."  They were not told that they had a choice, or that they might *infer* that conclusion; they were told only that the law presumed it.  It is clear that a reasonable juror could easily have viewed such an instruction as mandatory.

442 U.S. at 515 (alteration in original) (emphasis added).  Here, the trial court not only used the terms "may" and "nonconclusively" to indicate that the inference was permissive, it also used "infer."  Because the challenged instruction was proper, counsel cannot have been ineffective for failing to object to it.

iii

Stojetz's third, and final, subclaim is a hodgepodge of sub-subclaims.  Of the various allegations lodged, however, only one was raised on direct appeal, namely, that trial counsel were ineffective for failing to object to the introduction of victim-impact evidence during the trial's guilt-phase closing argument.  His remaining sub-subclaims have therefore been procedurally defaulted.

As previously discussed, "Ohio employs a bifurcated system of appellate review." *Hand*, 871 F.3d at 408.  "For the first type of claim—those based only on evidence contained in the trial record—a convicted defendant is expected to raise the claim on direct appeal or else the claim is barred by the doctrine of *res judicata*." *Ibid.*  Since Stojetz's claims based on prosecutorial misconduct do not involve supplementation of the trial record, they should have been raised on direct appeal.  Stojetz's sub-subclaim that trial counsel were ineffective for failing to object to various penalty-phase comments by the prosecutor, however, was only raised in the context of an ineffective-assistance-of-appellate-counsel claim and only in his application to reopen his direct appeal.  As for his assertion that counsel were ineffective for failing to object to the discriminatory use of peremptory challenges, it was not presented in any form to the Ohio courts.  Accordingly, those claims have been defaulted unless Stojetz demonstrates that there was cause for his not following the procedural rule and that he was prejudiced by the error. *See id.* at 407.

Stojetz does not offer any such argument regarding his failure to raise the sub-subclaim that trial counsel were ineffective for failing to object to the prosecution's allegedly improper penalty-phase comments. Accordingly, no relief is warranted on that set of claims.

Regarding his assertion that trial counsel were ineffective for failing to object to the prosecution's discriminatory use of peremptories, Stojetz argues that "ineffective assistance of post-conviction trial counsel may constitute cause for a default[.]" Appellant Br. 112. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court created an exception to the general rule that ineffective assistance of postconviction counsel does not establish cause for a procedural default of an ineffective-assistance-of-trial-counsel claim. *Id.* at 14–15. As explained in *Trevino v. Thaler*, 569 U.S. 413 (2013), *Martinez* held that such a procedural default could be excused where:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Id.* at 423 (alterations in original) (quoting *Martinez*, 566 U.S. at 14, 17). In *Trevino*, "the Court modified the fourth element to apply to situations where state law makes it 'highly unlikely' that a defendant will have a 'meaningful opportunity' to raise ineffective-assistance claims on direct appeal." *Williams v. Mitchell*, 792 F.3d 606, 615 (6th Cir. 2015).

While we have held that *Martinez* does not apply in Ohio and have questioned the applicability of *Trevino* in that state, *ibid.*, Stojetz's claim fails for a far simpler reason: he offers no basis for judging that *trial* counsel were ineffective for failing to object to the prosecution's use of peremptories. In particular, Stojetz fails to demonstrate that trial counsel "made errors so serious that [they were] not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. He does not identify any female jurors who were removed for discriminatory reasons. Nor does anything in the voir dire transcript suggest that the prosecution used its peremptories in a discriminatory manner. For instance, the prosecution only used four of its six peremptory challenges on women, and none of its peremptory challenges

on the alternative jurors despite two of them being women. Furthermore, of the female jurors dismissed, one indicated that imposing the death penalty would be difficult for her to do, another expressed mixed feelings on her questionnaire regarding its imposition, and a third indicated that her brother was incarcerated at the time. Because nothing said or done during voir dire would suggest to a reasonably competent attorney that the prosecution exercised its peremptory challenges to exclude women from the jury, trial counsel cannot have performed deficiently in failing to object to the peremptories' use; and this, in turn, means that postconviction counsel cannot have act ineffectively in failing to argue otherwise.

Finally, while Stojetz's remaining sub-subclaim—that trial counsel were ineffective for failing to object to the prosecution's reference to victim-impact evidence during the trial's guilt phase—was not procedurally defaulted, it is meritless. Stojetz objects to the following statement, which was made during closing argument:

> We know one thing for sure, that around 11:45, 11:50 on April 25, 1996, Damico Watkins was alive. He was 17 years old, he was from Cincinnati, Ohio. He was not perfect. He was in prison and he was in one of the units that children, young men from around the State of Ohio who have been tried as adults are placed. *But in the end he wasn't that much different from you or me. He had people that loved him, he had people who he loved, he had dreams, desires, I am sure he wanted to get out of prison and go about his life. He wanted to live.*

*Stojetz*, 2014 WL 4775209, at *53. The Supreme Court of Ohio denied this claim on the merits, *Stojetz*, 705 N.E.2d at 337, as did the district court, *Stojetz*, 2014 WL 4775209, at *58. In reaching its conclusion, the district court noted that the prosecutor's comment "constituted a minimal portion of the entire culpability-phase closing arguments[,] . . . were more general than specific, more mild than brash, and did not involve prolonged dwelling on the character or feelings of Damico Watkins." *Ibid.*

The district court's determination was correct. In *Wilson v. Bell*, we explained that "an ineffective assistance of counsel claim based on trial counsel's failure to object to prosecutorial misconduct 'hinges on whether the prosecutor's misconduct was plain enough for a minimally competent counsel to have objected.'" 368 F. App'x 627, 636 (6th Cir. 2010) (quoting *Washington v. Hofbauer*, 228 F.3d 689, 698 (6th Cir. 2000)). Accordingly, for Stojetz to win on this sub-subclaim, it must be the case that (1) the prosecutor's conduct was "plainly improper"

and (2) counsel were constitutionally ineffective for failing to object. *Hofbauer*, 228 F.3d at 698–99. Furthermore, because the Supreme Court of Ohio applied the correct legal standard when it addressed this sub-subclaim on the merits, we apply the "doubly deferential standard of *Strickland* and AEDPA" when engaging in the latter inquiry. *Pinholster*, 563 U.S. at 202 (quotation marks omitted).

Trial counsel were not constitutionally ineffective because the prosecutor's comments were not plainly improper. Two considerations underlie this conclusion. First, as we have noted on more than one occasion, there is no per se prohibition on the introduction of victim-impact evidence during the guilt phase of a trial. *Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004) ("[T]his court has approved [of] victim[-]impact evidence during the guilt phase . . . as an extension of *Payne*[ *v. Tennessee*, 501 U.S. 808 (1991)]."); *see also Byrd v. Collins*, 209 F.3d 486, 532 (6th Cir. 2000). Second, we have previously expressed skepticism as to the impropriety of a prosecutor making isolated, humanizing comments regarding a victim during closing arguments. In *Byrd*, for instance, we held that it was "far from clear" that the prosecutor acted improperly when, during the guilt-phase closing argument, he said:

> After stripping [the victim] of his personal possessions, his belongings, the store's belongings, and [the victim's] pride, [the Petitioner and his accomplice] stripped him of his life, his breath, and his blood.
>
> . . .
>
> [The victim] will never see the sun. [The victim] will never feel the chill of fall. He will never watch his youngsters grow. He will never break bread with his wife . . . .

*Ibid.* Given the similarities between the statements in *Byrd* and in this case, skepticism is likewise warranted here. At most, then, counsel failed to object to comments whose impropriety was questionable. Accordingly, because (1) a "claim of *Strickland* ineffectiveness [based on the failure to object to alleged incidents of prosecutorial misconduct] hinges on whether the prosecutor's misconduct was *plain* enough for a minimally competent counsel to have objected[,]" *Hofbauer*, 228 F.3d at 698 (emphasis added) and (2) the misconduct in this case—if it occurred at all—does not rise to this level, Stojetz is not entitled to relief on this final sub-subclaim.

E

In his seventh claim, Stojetz contends that trial counsel were ineffective for failing to object to testimony from prosecution witness Andre Wright. Wright, who was in Adams A at the time of the incident, testified that he saw Stojetz obtain the prison-cell keys from a corrections officer, open the door to Watkins's cell, and enter. Wright then stated, "I guess they stuck [Watkins] a couple of times while inside the cell," characterized Watkins as "scared" and "not able to think," and asserted that Stojetz entered Adams A "with intention to kill." Stojetz contends that such statements constitute inadmissible opinion evidence. Because the Supreme Court of Ohio denied this claim on the merits, *Stojetz*, 705 N.E.2d at 337, and because AEDPA applies to this case, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," *Richter*, 562 U.S. at 105. The district court correctly determined that there was. *Stojetz*, 2014 WL 4775209, at *83–84.

A reasonable person could find that the challenged testimony was, at a minimum, non-prejudicial. With respect to Wright's musing about what occurred in Watkins's cell, it can hardly be called "speculation," let alone prejudicial speculation, given that (1) Wright testified that he observed blood on Watkins as Watkins escaped his cell, (2) a trail of blood began directly outside Watkins's cell, and (3) Wright observed Watkins being stabbed outside of his cell by the group that had entered the cell earlier. *See Stojetz*, 705 N.E.2d at 340. Likewise, Wright's characterization of Watkins's mindset was not prejudicial given that Wright and another juvenile inmate testified that Watkins shouted, "I didn't do nothing," while he was being chased through the cellblock and that he begged for his life while being stabbed. Finally, Wright's statements about Stojetz's mindset were not prejudicial given, *inter alia*, eyewitness testimony that Stojetz stabbed Watkins multiple times after Watkins fell to the ground; that post-attack, the attackers said, "We killed the nigger. We did what we had to do," and wrote "Don't fuck with the [Aryan Brotherhood]" on the wall; and that immediately after the incident, Stojetz said to a corrections officer, "I told you it was going to happen." Because the evidence at trial overwhelmingly showed that Stojetz entered Adams A with the intention to kill, the Supreme Court of Ohio's determination was reasonable. Stojetz's seventh claim therefore fails.

IV

Beyond raising an exhaustive list of ineffective-assistance-of-trial-counsel claims, Stojetz also alleges prosecutorial misconduct based upon the withholding of exculpatory and mitigating evidence. More specifically, in his second claim, Stojetz asserts that the prosecution violated his substantive-due-process right to fair and individualized sentencing by failing to disclose his Ohio Department of Rehabilitation and Correction ("ODRC") medical records. Those records showed that while incarcerated, Stojetz's throat was cut by another inmate, resulting in a "5 to 6 inch long gaping wound[.]" Appellant Br. 28. Stojetz further asserts that this failure to disclose rendered his sentencing proceedings fundamentally unfair because it allowed the State to knowingly present false information that discredited expert testimony that supported Stojetz's mitigation theory. *Id.* at 34, 39.

Stojetz first presented this claim in a second state postconviction petition and in an application for a new trial. The trial court dismissed the petition and the new-trial motion on the grounds that they were untimely and that the statutory exceptions listed, respectively, in O.R.C. §§ 2953.23 and 2945.80 did not apply. The Court of Appeals of Ohio affirmed the judgment of the trial court, *Stojetz*, 2010 WL 2252191, at *2, *5, and the district court agreed that the petition and application were, among other things, untimely, *Stojetz*, 2014 WL 4775209, at *123. Applying the four-part *Maupin* test, the district court correctly determined that Stojetz's claim was procedurally defaulted and that he had failed to excuse the default. *Ibid.*

There is no question that Stojetz's petition and application were untimely. At the time of Stojetz's sentencing, "[a] petition for postconviction relief [in Ohio had to] be filed no later than 180 days after the date on which the trial transcript [was] filed with the court of appeals in the direct appeal." *Stojetz*, 2010 WL 2252191, at *1. Similarly, Stojetz was required to file his motion for a new trial "within 120 days of the end of the proceedings if the basis for the motion [was] the discovery of new evidence." *Id.* at *5. Because Stojetz filed his petition and application ten years after the Supreme Court of Ohio had affirmed his death sentence, his petition and application were time-barred unless one of the statutory exceptions applied.

None did.   Under O.R.C. § 2953.23, an untimely petition is permitted only if the petitioner shows that he "was unavoidably prevented from discovery of the facts upon which [he] must rely to present the claim for relief" or "the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right."   O.R.C. § 2953.23(A)(1)(a).   "In addition, the prisoner must show that, but for the error, no reasonable fact-finder would have found him guilty, or, in a death penalty case, eligible for the death sentence." *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013).   This exception did not apply to Stojetz because he did not rely on a right newly recognized by the Supreme Court and because, as the Court of Appeals of Ohio correctly observed, Stojetz "was certainly aware of the facts underlying this claim, as they existed since September 1987 and appellant first raised the issue at trial[,]" *Stojetz*, 2010 WL 2252191, at *2.   After all, Stojetz asserts that at trial the prosecutor "indicated that he had reviewed the ODRC medical records[.]"   Appellant Br. 35.   Presumably, then, Stojetz was aware of his ODRC records as of that moment.   Even more problematic for Stojetz is his penalty-phase statement to the jury detailing the assault in question:

> [w]hen I was walking up the hallway, my towel was soaked with blood.  At that time I had to kick the crash gates and motion for the officer to let me through the crash gate.  I showed him my neck.  He opened the crash gate.  I walked off by myself.  This is maximum security.  I walked by myself to the hospital.  When I got to the hospital there was a nurse.  Lucky for me she knew what to do.  She clamped my vein until I went to the outside hospital and the doctor that was in there saved my life.

There is no question, therefore, that Stojetz knew that he had been injured and that he had received treatment for that injury at the prison.   For a similar reason—namely, he was not "unavoidably prevented from the discovery of the evidence upon which he must rely," *see* O.R.C. § 2945.80—Stojetz's motion for a new trial was also procedurally defaulted under Ohio law.

Furthermore, because the state courts enforced those procedural rules, and because those rules also constitute independent and adequate bases for denying review of a federal constitutional claim, *cf. Davie v. Mitchell*, 547 F.3d 297, 311 (6th Cir. 2008) ("This court has previously held that where an Ohio defendant is unable to satisfy the statutory requirements to

bring a second post-conviction petition, procedural default analysis applies."); *Matthews v. Ishee*, 486 F.3d 883, 889–90 (6th Cir. 2007) (finding that there is "no question [defendant] procedurally defaulted his claim" where the Court of Appeals of Ohio held that a motion for new trial was untimely and that the defendant had not exercise reasonable diligence), the only question is whether Stojetz can show the requisite cause and prejudice.

He cannot. Stojetz asserts that the procedural default is excused because the State violated its obligation under *Brady* by failing to disclose his ODRC records. We have been clear, however, that a *Brady* violation does not occur when "the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Accordingly, no *Brady* violation occurred with respect to Stojetz's ODRC records for the reasons noted in the preceding paragraphs. Because Stojetz fails to show cause for his failure to follow Ohio's procedural rules, his second claim is procedurally defaulted.

V

In his eighth claim, Stojetz contends that the district court erred in failing to reconsider, pursuant to *Maples*, its determination that he had procedurally defaulted a number of claims by not litigating an appeal of the postconviction trial court's decision. Specifically, Stojetz argues that because his postconviction counsel—Gideon—abandoned him, he can establish cause for the default. As for prejudice, Stojetz asserts that "there are meritorious arguments that Gideon failed to preserve that satisfy this standard," though the only one that he identifies is his claim that trial counsel were ineffective for depriving him of his right to testify. Appellant Br. 130.

There is no question that Stojetz's postconviction appellate counsel's performance was subpar. Not only was Gideon non-responsive to inquiries by Stojetz's sister regarding the status of her brother's appeal, he also failed to file a brief in those proceedings, resulting in the dismissal of the appeal with prejudice. *Disciplinary Counsel v. Gideon*, 819 N.E.2d 1103, 1104 (Ohio 2004). Based, in part, on these failings, the Supreme Court of Ohio suspended Gideon's license for two years, though it stayed the sanction on the condition that he continue receiving treatment for "deep depression and anxiety[.]" *Id.* at 1105–06.

Nevertheless, the district court was correct to reject Stojetz's argument, as Gideon's behavior was more akin to neglect than abandonment. *Stojetz*, 2014 WL 4775209, at *114. Unlike the counsel in *Maples*, Gideon communicated with court staff and the Ohio Public Defender's Office regarding the progress of the appeal; he sought time extensions to file the postconviction appellate brief and leave to exceed the page limit; when he failed to submit the brief on time, he promptly responded to a show-cause order, explained why the appeal should not be dismissed, and obtained a time extension; and days before the final filing deadline, he spoke to court administrators about the brief. Nor was counsel's non-responsiveness of the same degree as in cases where the Supreme Court has indicated that abandonment occurred—it appears that Gideon's non-responsiveness lasted for only two months. *See Maples*, 565 U.S. at 282 (approvingly citing Justice Alito's concurring opinion in *Holland v. Florida*, 560 U.S. 631 (2010), which stated that one cannot be held constructively responsible for the conduct of an attorney where, *inter alia*, there is a "near-total failure" to respond over several years). Based on these facts, it cannot be said that Gideon was "not operating as [Stojetz's] agent in *any* meaningful sense of that word." *Maples*, 565 U.S. at 282 (emphasis added) (quoting *Holland*, 560 U.S. at 659). Thus, as harsh as it may appear, Stojetz has not shown cause for the postconviction procedural defaults. *See Maples*, 565 U.S. at 281 ("[W]hen a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause.").

VI

Stojetz's penultimate claim is that the district court abused its discretion in denying his request for access to the grand-jury transcripts from his indictment and those of his accomplices. Stojetz contends that discovery should have been granted because:

> [i]t is unknown if the State pursued [two mutually exclusive theories, namely, that Stojetz was the actual killer and that he was not,] before the grand jury. And if so, whether the grand jury rejected one over the other. Further, it is unknown who the State pursued in which fashion regarding the six co-defendants.

Appellant Br. 134. Stojetz further suggests that the court erred because it used the wrong standard when assessing his request.

The district court did not abuse its discretion. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). "A district court may, however, permit discovery in a habeas proceeding if the 'petitioner presents specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate.'" *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001)). Because Stojetz offers nothing more than vague musings on how the grand-jury proceedings might have unfolded, the district court correctly determined that he failed to satisfy the "good cause" standard required to obtain habeas corpus discovery. *See Stojetz*, 2014 WL 4775209, at *75 n.12.

## VII

Stojetz's tenth, and final, claim—that he is actually innocent of aggravated murder and that his death sentence is arbitrary and capricious—consists of two analytically distinct subclaims. We accordingly treat them separately.

### i

Stojetz first raised his actual-innocence claim during postconviction proceedings, where it was rejected on the merits by the trial court. On federal habeas review, the district court denied the claim, finding that "the state trial court's decision . . . did not contravene or unreasonably apply clearly established federal law as determined by the Supreme Court." *Stojetz*, 2014 WL 4775209, at *68.

To be clear, Stojetz has forwarded a freestanding actual-innocence claim, not a gateway-innocence claim. In other words, rather than asserting a claim of innocence to overcome a procedural bar to the consideration of a constitutional claim, *see Schlup v. Delo*, 513 U.S. 298, 326–27 (1995), Stojetz argues that he is entitled to habeas relief, full-stop, because he is innocent, *see House v. Bell*, 547 U.S. 518, 554 (2006) (citing *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). This distinction matters because the Supreme Court has yet to answer whether freestanding innocence claims are cognizable in habeas corpus. *House*, 547 U.S. at 554–55.

Despite such uncertainty, the Court has provided two guideposts that allow us to dispose of Stojetz's first subclaim. In *Herrera*, the Court mused that were freestanding innocence claims cognizable in federal court, "the threshold showing for such an assumed right would necessarily be extraordinarily high." 506 U.S. at 417. Then, in *House*, the Court elaborated on this point, stating that the showing required for such a hypothetical claim would be greater than that required for a gateway-innocence claim. 547 U.S. at 555. Logic therefore dictates that if Stojetz cannot meet the standard for a gateway-innocence claim—viz., establishing that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt[,]" *Schlup*, 513 U.S. at 327—he cannot meet the burden implied in *Herrera*.

Stojetz's showing falls well short of even *Schlup*'s lower threshold. In *House*, the Court held that although the petitioner—who had presented (1) laboratory tests showing that semen found on the victim did not match his DNA, (2) testimony indicating that poor evidence control may have led to the transfer of the victim's blood to his clothing, and (3) substantial proof that the victim's husband was the actual killer—met the *Schlup* standard, it was a close question. 547 U.S. at 540–55. Based on this determination, the Court then concluded that the petitioner's showing fell short of the threshold for a hypothetical freestanding innocence claim. *Id.* at 554–55. Given that the evidence offered by Stojetz—presumably, the deposition testimony of two accomplices and three juvenile inmates—pales in comparison to that offered in *House*, especially when assessed in light of the overwhelming evidence of Stojetz's involvement in the stabbing death of Watkins, he too falls short of meeting *Herrera*'s threshold. *See supra* Part III.B, E. Stojetz's actual-innocence claim is, therefore, without merit.

ii

Stojetz's second subclaim—that his death sentence is arbitrary and capricious—was rejected by the Supreme Court of Ohio on the merits. *Stojetz*, 705 N.E.2d at 344–47. Because AEDPA applies to this case, the district court limited its inquiry to whether the Supreme Court of Ohio's decision contravened or unreasonably applied clearly established federal law. *Stojetz*, 2014 WL 4775209, at *100 (citing *Getsy v. Mitchell*, 495 F.3d 295, 308 (6th Cir. 2007)). The district court then denied the Appellant's subclaim, observing "[t]hat Petitioner's jury, the trial

court, and the Ohio Supreme Court gave certain factors less weight than Petitioner preferred does not undermine their determination that Petitioner's death sentence was appropriate." *Ibid.*

Once again, the district court's decision was correct.  Simply put, Stojetz argues that the jury and courts either did not hear or did not properly credit the following mitigating evidence: his ODRC medical records, testimony that he suffered from PTSD and had had a troubled childhood, evidence that Watkins intended to attack Stojetz and his associates, and the fact that of the six people who stormed Adams A on April 25, 1996, he is the only one on death row. Appellant Br. 138, 140, 142, 145.  Stojetz glosses over, however, that during the mitigation phase of the trial: he gave an unsworn statement in which he discussed having his throat slashed while in prison and his belief that Watkins planned to attack him; various family members testified about his history, character, and background, including his childhood; and a clinical psychologist expressed his belief that the Appellant "sees the world as a threatening place" and that Stojetz suffers from PTSD.  *See Stojetz*, 705 N.E.2d at 344–46.  Accordingly, almost all of the considerations to which Stojetz now points were, in fact, before the jury in some form; jurors simply declined to accord them the weight that he prefers.  Likewise, the Supreme Court of Ohio extensively discussed these factors, but ultimately decided that they deserved little-to-no weight. *See id.* at 346–47.  Finally, given that "we have long held that the common-law rule of consistency has no application to conflicting verdicts returned by different juries in *separate trials*[,]" *Getsy*, 495 F.3d at 307, the fact that Stojetz's accomplices did not receive the death penalty cannot be a basis for deeming his death sentence to be arbitrary and capricious.  There is no basis, therefore, to conclude that the Supreme Court of Ohio's determination contravened or unreasonably applied clearly established federal law, as determined by the Supreme Court. Stojetz's final claim is accordingly denied.

## VIII

Based on the foregoing, the claims in John C. Stojetz's habeas petition are all either procedurally defaulted or meritless.  We therefore AFFIRM the decision of the district court and DENY the petition for a writ of habeas corpus.